JOSEPHINE KREITZ and CLARA KREITZ, Appellants, v. JOHN M. EGELHOFF et al.

Division One, December 23, 1910.

1. **DAMAGES: Good Faith in Offer to Perform: Demurrer.** Whether or not plaintiffs' offer to perform their contract of lease was made in good faith, was for the jury in the lessees' suit for damages for being denied possession, and not for the court upon the lessor's demurrer to their case.

2. **LEASE: Loss of Possession by Bankruptcy: Right to Possession Under Future Lease.** Where the lessees' contract was that, while they were in possession under a first or existing lease, they were to reconstruct and enlarge the buildings, and they lost the first lease by voluntary bankruptcy and ceased to pay rent thereunder, and the possession passed to another tenant, they were not entitled to possession under the second lease until they first performed their contract to rebuild during the life of the first lease; and having voluntarily thrown away their right

to perform during that time, their rights to possession and profits under the new lease were lost. And it makes no difference that, after they had by their voluntary acts lost the first lease, and possession thereunder, they demanded possession during the life of that lease in order that they might build. Having voluntarily failed to perform, they cannot recover damages from the lessor for refusal of possession.

Appeal from Jackson Circuit Court.—*Hon. E. E. Porterfield,* Judge.

AFFIRMED.

*Reed, Atwood, Yates, Mastin & Harvey* for appellants.

*McCune, Harding, Brown & Murphy* for respondents.

LAMM, P. J.—Plaintiffs sue for fifteen thousand dollars damages for defendants' failure to comply with a covenant to deliver possession of certain premises and to carry out other terms of a written lease.

The petition alleges and the answer admits the execution of the lease on the 3d day of September, 1904. This lease demised to plaintiffs a certain brick building and basement, known as 1029 Main street, Kansas City, Missouri, for a term of five years, commencing on the 1st day of February, 1906, at a rental of seven hundred dollars per month. It contained provisions as follows for a renewal term of five years: "Provided plaintiffs would agree to pay as much as any other party making a bona fide offer to lease such premises;" that the premises were leased "in the present condition thereof;" for repairs, keeping the premises free from filth, nuisances, danger of fire and against carrying on any unlawful business; for forfeiture on violating any covenant or agreement, including default of payment of rent; for surrender of peaceable possession at the end of the term; and for regulating liability for

rent in case of fire, etc. As a further consideration, the lessees covenanted to erect at their own proper expense, doing all the necessary excavating for a cellar at the rear of the building now on the premises, "a two-story or higher brick building about 24 feet by 55 feet with 18-inch foundation walls and 13-inch brick walls and gravel roof," within one year from the date of the lease, that is, within one year of the 3d day of September, 1904—these betterments and improvements to be and remain the absolute property of lessors.

The petition alleges and the proof shows the lease contained a provision that the lessees would not convey or assign it without the written consent of lessors. Further, that neither it nor the premises should pass "by operation of law nor by any species of conveyances by the parties of the second part or their heirs."

The answer denies that plaintiffs owned the lease or had any right, title or interest therein. It avers that all such right, title and interest prior to the 1st day of February, 1906, passed out of plaintiffs and was vested in defendants. It further alleges (and the proof shows) that about two months after the lease was executed, to-wit, on the 7th day of November, 1904, plaintiffs, as individuals and as copartners, filed their voluntary petition in bankruptcy and on said date by virtue of such proceeding in the United States District Court for the Western District of Missouri were declared bankrupts as individuals and as copartners. The answer also alleged (and the proof shows) that plaintiffs listed their assets under oath as individuals and copartners in said bankrupt proceeding. It further alleges (and it is contended on one side that the proof shows, on the other that it does not show) that the right, title and interest of plaintiffs in said leasehold as individuals and as copartners was listed as an asset, was sold by virtue of the bankrupt proceeding to defendants, who became the owners of the lease—this sale being made by the trustee in bankruptcy in

due course of law and duly approved by proper authority. The petition alleges and the answer denies performance on the part of plaintiffs. The petition alleges the value of the leasehold at $15,000 over and above the rent reserved to be paid and the betterments and improvements to be made. The answer denies such or any value or that plaintiffs were damaged at all.

At the close of plaintiffs' case, defendants asked an instruction in the nature of a demurrer to the evidence, which instruction was allowed and a verdict accordingly thereby coerced. On due steps, plaintiffs come here by appeal.

The case can be disposed of without setting forth the testimony. It may proceed on the theory it tended to show that on the 3d day of September, 1904 (the date of the lease in question, which for convenience we will call the second lease), plaintiffs held possession of the premises under a former lease, which we will call the first lease. The term of the first was from February 1, 1901, to February 1, 1906—the second commencing where the first ended. During the life of the first lease (i. e., before the bankruptcy) plaintiffs conducted a millinery store in the demised premises. The building was two stories high in front, but did not extend that high all the way to the rear—the last fifty-five feet back to the alley being only one story high. The walls of the one-story part were too old, thin and weak to support a second story. There was a basement or cellar under the front part of the building, but it was unconnected with the outside and could not be rented. Under the one-story part there was no basement. The building was in a region where leaseholds were in demand and rents stiff. Plaintiffs were paying $375 monthly rent during the term of the first lease. While things were in this fix and their term had yet nearly a year and a half to run, they made the second lease. That lease contemplated a rather ambitious plan of improvement at the expense of the

tenants, viz.: The walls of the one-story part of the old building were to be razed, excavating was to be done for a basement under that, which was to be connected with the basement of the front part. Access to the basement from the street was to be provided. Then a new building 24 by 55 feet was to be erected, two stories high, so as to make a two-story building from street to alley—remodeling it and making the building rentable from top to bottom and from end to end. The working theory indulged was that the rear of the first story could be rented for a saloon; that one-half of the front of the first story could be rented for a jewelry store; that plaintiffs could conduct their millinery business in the other half of the front; that the basement could be rented for a turkish bath establishment; and that the second story could be rented, the front to dentists and the back part to a "first class manicurist and dressmaker." The evidence tends to show that before or presently after the second lease was made some negotiations, never consummated, began with a jeweler in Des Moines, Iowa; that some negotiations, never consummated, began with a colored man named Lucas to run turkish baths in the basement; that some were commenced and never consummated with a brewer to establish a tippling shop in the rear of first story—all when reconstructed. There was trouble in obtaining a license and the projected dramshop died of some prenatal illness.

At that time plaintiffs had prepared paper plans and specifications for the remodeling, but presently fell over the brink of insolvency and began proceedings in the Federal court to be relieved of their pecuniary liabilities. It creeps into the case that they were discharged as bankrupts in October, 1905, though no certificate appears. It is conceded the first lease was listed as an asset and sold. It is not as clear as it might be how possession was held of the premises after plaintiffs' failure—we mean whether under plaintiffs' first lease so

sold as an asset, or whether it was held by virtue of a new lease between defendants and tenants then put in possession. But we gather that the old lease was forfeited; that plaintiffs left possession; that the premises were not at all times occupied; that finally they were rented, first to Mr. Moore, and then to a Mr. Green, for $525 per month, and were in the latter's possession when performance was put on foot by certain acts, viz., plaintiffs made an oral contract with one Miller to do the excavating for the new two-story part of the building. No sum was mentioned, but he was to superintend the work for so much per day, and was to hire men to do the digging, and teams to remove dirt and debris, to be paid by plaintiffs. Miller, prior to employing men, went to Green, defendants' tenant, and demanded the right to commence work—a work necessarily involving the destruction of the back fifty-five feet of his store room. Green refused permission. Having consulted counsel, on July 3d, 1905, plaintiffs telegraphed the agent of defendants they would begin work on the building according to their lease on July 5th. They followed that telegram on July 6th, with a registered letter referring to their telegram and notifying defendants that Green had stopped them from building and from removing the old building, closing with the inquiry: "What are you going to do about it? An answer will oblige." Following the matter up smartly, on July 10th they sent another registered letter, recounting the terms of their telegram and former letter, concluding with: "We demand that you permit us through your tenant to enter on the premises to the end that we may erect the building agreeable to our contract. We shall hold you to a fulfillment of your contract. An early answer will oblige." Some, if not all, of these communications, we take it, were prepared by counsel and were intended as such offers of performance as would be effective in a lawsuit if refused. It will be observed, as said, that the building was to be

completed by the 3d day of September, 1905. and the evidence tends to show that plaintiffs were laboring under the notion that defendants were entitled to sixty days' notice. On January 30, 1906, plaintiffs by registered letter sent to the agent of defendants to Olathe, Kansas, a certified check for $700 as and for the first month's rent on the second lease due on the first of February following. Accompanying this check was a letter under their counsel's letter head, referring to the second lease by date, parties and description of property, and defendants were not only asked to receipt for the payment, but were notified that plaintiffs demanded possession of the premises on February 1st, agreeable to the lease—a lawsuit to follow if the demand was not acceded to. This letter with the enclosure was returned by the postmaster after being opened by the agent of defendants. None of the other communications were answered. Suit following on February 12th. We do not see that any steps were taken towards performance after the bankrupt proceedings were begun in November, 1904, until in July, 1905. Some of the testimony falling from the lips of plaintiff, Josephine, indicates that the second lease was not listed. This was put on the theory that it was not yet a live lease and the trustee in bankruptcy had no business with it. It seems to have been sent to the State of Kansas and held there during the bankrupt proceedings. There is other testimony bearing the construction that Josephine, who transacted the business for plaintiffs, did not know whether or not the second lease was listed as an asset. The records of the bankrupt court were not introduced in this behalf by plaintiffs. Josephine, when on the stand, admitted she had heard the second lease had been sold as an asset; that "a piece of money passed" in regard to it. Plaintiffs' testimony also tends to show that if the new building had been completed and the property renovated and put in good condition, the basement would have been rentable

at one hundred dollars per month, with a street entrance, and the first and second stories could have been rented at a figure, including the basement rent, in excess of the seven hundred dollars monthly rent reserved in the second lease. Miss Josephine Kreitz testified the leasehold under the second lease had a considerable money value at the time it was executed. She considered it an asset, but that the law did not make it part of the bankrupt estate. She represents one of the defendants, shortly after the adjudication of bankruptcy, as estimating it worth one thousand dollars, presently, in the same conversation as worth two thousand dollars, and presently as proposing to her to have it burned and got out of the way. He asked for the lease but its production was excused because she did not have it with her. We infer he claimed it was inoperative because of the bankruptcy. But the vagueness of the testimony on this score prevents much substance being made out of it. There was a rough estimate of the cost of remodeling the building—whether of the whole cost when ready for occupation from basement to top, we cannot make out. Plaintiff Josephine further testified that she had some arrangement for the money with which to perform through a man in St. Louis, who was willing to take security on the rental income. No contract to that effect was offered in evidence. The certified check for the first month's rent was drawn against the "family savings." Plaintiffs' estate paid twenty-three per cent on their indebtedness and they asserted their ability and readiness to perform in good faith. An attorney, Mr. White, was present at the bankrupt sale. Plaintiffs, without producing a report of that sale or any proceedings of the bankrupt court, undertook to show by him that he attended the sale of all the assets and the second lease was not offered for sale and was not sold. His testimony being excluded on objection, the point was saved. This, with the ruling on the demurrer to the evidence, is now assigned for error.

We have reached the conclusion the demurrer was well decided. This because:

(a)  Some doubt, *arguendo*, is thrown on the good faith of plaintiffs' acts looking to performance. Plaintiffs, before final discharge in bankruptcy, but presumably having faith in that discharge forthcoming, claim to have hired Miller to raze the walls of the old and excavate and haul away the dirt and *debris* for the new building—all this by virtue of the terms of the second lease. At that time they had been adjudicated bankrupts, but were still in court in that proceeding. Nevertheless, though ground bare and clean of property by a bankrupt-mill, they seek performance of an onerous lease which contemplated a heavy outlay of ready cash. To that end they demand possession. As we grasp the run of the argument, counsel doubt the good faith of the tender of performance; they doubt present ability to perform; they suspect the tender of performance to be a cloak for the real purpose of pressing a thorn in defendants' side, thereby spurring them to a compromise settlement; they suspect the offer to perform was merely intended to impale defendants on the horns of a dilemma, viz., a lawsuit with them, for one horn, or the destruction of the one-story part of their building for a season and the consequent loss of rent from their then tenant and damages for ousting him from possession, for the other. But whatever substance there may be in that line of argument, it was for the jury and not for us. Respondents took the issue of good faith from the jury where it belonged, and may not bring it here where it does not belong. Whether there was a bona fide offer to perform was for the triers of fact.

(b)  But there is a larger and deeper phase of the matter of performance, fairly arising on this record, which seems an impassable obstacle to recovery. That phase is this: Plaintiffs sue at law for damages for non-performance of a contract. Defendants were not

obliged to perform except on condition that plaintiffs performed. That he who sues at law for damages for non-performance must allege and prove his own performance is elementary. Recognizing that principle, plaintiffs allege performance on their part in so far as they were able to perform. They concede there was not full performance, but they excuse themselves because of the wrongful acts of defendants in preventing full performance in rebuilding. Now, if defendants wrongfully prevented full performance, they may claim nothing by virtue of so much of the non-performance as was brought about by their own wrongful act. Assuming so much as good doctrine, how does the case stand?

In contracts the subject-matter and the object to be attained should be looked to. In other words, the scope, purview and intendment of the contract have to be kept in mind as prerequisites to its interpretation and to ascertain and settle rights thereunder. Now, the broad fact is that when plaintiffs made the second lease, they were already (and were to continue) in possession of the premises under the first. It was not intended that in order to perform the contract to rebuild they should intrude on the rightful possession of another. *Per contra,* their own rightful possession under the first lease was contemplated during the whole time they were to perform that part of the contract requiring the walls of the one-story part of the building to be razed and a new building built. During that time their rent under the first lease was to accrue from month to month to defendants. It is obvious, then, that under the contract the burdens of not only all expense and outlay in remodeling, but of detriment to the possession in making the existing building unfit for business purposes, were on the shoulders of plaintiffs. They carried it all, *ex necessitate rei.* But there had been a vital change in that regard when plaintiffs sought to perform in July, 1905. They had then long

ceased to pay rent under their first lease, and were relieved from such liability by their voluntary act in seeking the shield of bankruptcy. So, too, their first lease was forfeited. They were no longer in possession. Possession passed to another tenant, who, in turn, had assumed the rent-paying burden they had lightly and voluntarily thrown off. In this condition of things, plaintiffs sought under the guise of performance to recover possession and destroy the new tenant's leasehold, interrupting his business, throwing upon him and upon defendants the grave annoyances and burdens to the possession incident to tearing down and rebuilding. We cannot well write the law to be that plaintiffs were entitled to the remarkable advantage of so remarkable a shift in contractual position. Whether they could have kept the first lease alive, retaining possession in order to perform the contract under the second lease, is not necessary for us to decide. This case proceeds on the theory they did not keep life in the first lease nor retain possession. The situation, whatever it was, the bitter with the sweet, was *theirs*. They made it, *ergo* they must face it and bow to it. Having gone out of possession of their own choice, they may not come in again during the term of the first lease except through defendants' choice. As they had no right to tear down and rebuild, except during the term and time of their own possession under the first lease, with rent-paying as an incident, they were not entitled to possession for rebuilding purposes at a time they were paying no rent whatever, and when they would oust the lawful possession of another. As they were not entitled to possession under their new lease unless they first performed their contract to rebuild within the year mentioned (i. e., during the term of the first lease), and as they voluntarily threw away their right to perform during the term, we see no escape from the conclusion that their right to possession and profits under the new lease were lost, when

they lost the right to performance, and with that loss falls their *locus standi,* their right to damages. We so hold, and this holding determines the case.

(c) Learned counsel well and ingeniously argue nice propositions of bankrupt law. For instance:

It is argued for plaintiffs that as defendants plead in their answer that the second lease was listed as an asset in bankruptcy, passed to the trustee and from him under the hammer to the purchaser at the bankrupt sale, the burden was assumed by defendants of proving those facts. They say defendants did not well carry that burden. *Contra,* defendants' counsel argue that there is inferential proof of the allegations, but they rely mainly on the proposition that since the trustee is presumed to do his duty the presumption is that it was listed and was dealt with as an asset. They argue, further, that it makes no difference whether it was listed or not, that the title to the lease passed by operation of the bankrupt law to the trustee and either remains in him or passed off to a stranger. On the other side it is argued that under the peculiar phraseology of this lease it could not pass by operation of law to the trustee. To this, defendants' counsel say that the title passed to the trustee *cum onere,* that is, burdened with contractual conditions, such as obtaining the consent of the lessors to a transfer. Other contentions are made; for example: By plaintiffs' counsel that the trustee had the right to elect whether he would take over an onerous lease as an asset, and he had the further right to abandon it as an asset, in either of which events the title would remain in the bankrupts. Counsel for defendants concede as much, but they say the burden is upon the plaintiffs to show such election or abandonment—in other words, the presumption is that the trustee performed his full duty in the first instance, and, as plaintiffs testify that the leasehold was of great prospective value, the burden rests on them to

231 Sup.—45

show it was not taken over by the trustee or was aban-doned.

The administration and exposition of the Bank-rupt Act is the peculiar province of Federal courts, and the appellate courts of a State have no call to ex-pound that law, except where it becomes necessary to determine a bankruptcy question in a case within its own jurisdiction. As the instant case has been allowed to break on a previous paragraph of the opinion, there-fore it is not one of that sort. Accordingly we reserve the questions discussed. It will be time enough to de-cide them when they arise in a case turning on them.

The views expressed also preclude the need of passing on the assigned error relating to the exclusion of the testimony of Mr. White.

Let the judgment be affirmed. All concur.