E. E. KELSO, RESPONDENT, v. LINCOLN NATIONAL LIFE INSURANCE Co., APPELLANT.—51 S. W. (2d) 203.

Kansas City Court of Appeals. May 23, 1932.

*Ben R. Estill* and *Charles M. Miller* for respondent.

*Meservey, Michaels, Blackmar, Newkirk & Eager, Roy P. Swanson* and *R. F. Baird* for appellant.

ARNOLD, J.—This is an action to recover commissions on the sale of life insurance policies alleged to be due plaintiff from defendant.

Defendant is a corporation, engaged in the life insurance business, with its home office at Fort Wayne, Indiana, authorized to do busi-

ness in the State of Missouri, and has a general agency in Kansas City, Missouri, in charge of one Paul R. Schweich, as general agent. The petition alleges that on February 23, 1923, defendant employed plaintiff as its special agent to procure applications for life insurance in defendant company in the Kansas City, Missouri, district, and in such other territory as might be assigned to him from time to time; that, upon said date, plaintiff accepted employment as such special agent and commenced the performance of his services thereunder; that among others whom he approached and whom he solicited as a policy holder of defendant company, was one C. O. Jones, a resident of Kansas City, Missouri, who became interested in a policy in defendant company, and plaintiff, continuing his duties under his employment, spent a great deal of time and effort in procuring said Jones as a policy holder; that immediately on his first interview with Jones, plaintiff gave the manager of defendant company at Kansas City full information of his efforts and plans in this behalf. That he continued in the performance of his said duties, and on or about May 1, 1929, and by reason of the efforts and work of plaintiff, said Jones made application for and received a policy of insurance in defendant company, in the sum of $500,000, upon the "emancipator form" of policy, and that he paid therefor in premiums, the sum of $10,200. And

"Plaintiff further states that he has performed all of the obligations upon his part to be performed under the terms of his employment; that the fair and reasonable value of his services so performed for defendant is $2,500, and that he has made demand upon defendant for the payment of said sum as a reasonable compensation for said services but that defendant has refused and still refuses to pay same or any part thereof."

Judgment is sought in the sum of $2,500.

The answer admits the corporate existence of defendant as alleged; and this is followed by a general denial. As affirmative defense, the answer alleges that plaintiff did, for a time, hold a special agent's contract with defendant, dated February 23, 1929, which provided, among other things, that plaintiff should devote his whole time to the performance of his duties as such agent and that he should not be entitled to any commission on premiums for insurance, unless such insurance was "fairly effected through the instrumentality of plaintiff, and unless his name should appear upon the application for such insurance as agent, and th·' '·· ·¹¹ cases where plaintiff's claim to commissions was disputed or was otherwise questionable, defendant should have the right to decide and settle the dispute, and its decision should be binding and conclusive; that if plaintiff should rebate or offer to rebate all or part of any premium on a policy of

insurance, same should *ipso facto* work an immediate termination of said contract . . .''

And the answer states plaintiff did not comply with the provisions of said contract; his name did not appear as agent upon the said application of said C. O. Jones, and such insurance was not fairly effected through the instrumentality of plaintiff.

The reply was a general denial of new matter contained in the answer; and, further replying, plaintiff states that ''if plaintiff failed to perform any of the terms of his employment, the same was prevented by the defendant, all of which plaintiff was ready and willing to perform.''

The cause was tried to the court and jury, resulting in a verdict and judgment for plaintiff in the sum of $1250. Motions for a new trial and in arrest of judgment were unavailing and defendant appeals.

In his supplemental brief, plaintiff attacks the sufficiency of defendant's statement of facts, in that it does not comply with the requirements of our rule 16; that it is not a ''clear and concise statement of the case without argument;'' that the statement which purports to contain, in narrative form, the testimony of all the witnesses is confusing and does not comply with the rule.

Examination of the alleged offending statement shows it to be fairly clear and concise, and fairly places before us facts sufficient for a clear understanding of the case. Plaintiff does not urge drastic action in this matter, but generously concludes to pass it ''and let the court deal with it.'' So dealing with it, we rule the statement attacked does not sufficiently offend in the manner charged to require any drastic action relative thereto by this court.

In support of his cause, plaintiff testified he had been in the insurance business previously and that he first started with defendant under a brokerage contract, and later, under a special agency contract of date February 23, 1929; that Paul R. Schweich, at that time, was manager of defendant's Kansas City office; that plaintiff did not know C. O. Jones personally, except that he had called on him three times in four years to solicit insurance; that in March, 1929, defendant issued a new form of policy known as the ''Emancipator Policy'' which Schweich explained to agents, including plaintiff; that immediately thereafter, plaintiff told Schweich that he (plaintiff) knew a man who would buy a $500,000 policy, and that it was C. O. Jones; that Schweich then told him that one of the other agents had Mr. Jones as a prospect; that plaintiff then said that Mr. Fehr, Jones's secretary, was plaintiff's friend and would help him; that Schweich then said the office should not be divided and that ''the thing for you to do is to get with this other fellow and go

fifty-fifty;'' that the other agent was Donald F. Shaw and he was called in and Schweich stated the plaintiff would work through Jones's secretary and Shaw would do the interviewing and ''You will split your commissions;'' and that Shaw said we would ''split our commissions'' and both names would appear upon the application; that plaintiff, later, met Mr. Jones's secretary on the street and gave him a sample of the policy in question, asking him to look it over; that he, plaintiff, saw the secretary and secured from him details of Jones's line of insurance then held and that he gave this data to Shaw; that a written proposal was prepared by plaintiff and Shaw, comparing Jones's present insurance with the proposed new policies; that Shaw interviewed Jones; that plaintiff brought Jones's secretary over to defendant's local office where he was interviewed by Schweich and Shaw; that Jones's secretary, Fehr, there said:

''I don't see how I am coming out on this case—I don't see where I am going to benefit;''

And that Schweich then offered Fehr a brokerage contract which was refused; that Schweich then told Fehr that he could not otherwise receive a commission; that plaintiff called on Fehr every day or two about the Jones insurance; that plaintiff did not know when the application was written or the policies issued, and he could get no information from Schweich or Shaw about it.

Plaintiff testified, over defendant's objection, that applications are sent to defendant's home office through the local manager. On cross-examination, plaintiff testified he had interviewed C. O. Jones twice previously, about 1928, for the Capitol Life Insurance Company; that for the same company another agent had sold Mr. Fehr a $5,000 policy; that on a third occasion, he went up to Jones's office and talked to Fehr; did not talk any plan of insurance, merely a casual visit; and that this was before his agency contract, and several months before the Emancipator Policy was issued; that Fehr was in Jones's office on the occasion of these visits and plaintiff saw him there; that his acquaintance with Fehr was nothing other than that; that he (plaintiff) never interviewed Mr. Jones about buying insurance from defendant.

On cross-examination, plaintiff testified that after the discussion as to whether Fehr could receive any part of the commission, and after he was told by Schweich he could not do so unless he took out a broker's contract, plaintiff's negotiations continued only two or three days; that plaintiff's name did not appear upon the application in controversy; that he did not communicate with defendant about his claim for commission before filing suit; that he was furnished with an agent's instruction book providing, among other things, that he should not be entitled to a commission unless the insurance was

fairly effected through his instrumentality, and that when two or more agents secure an application jointly, the credit shall be divided among the agents whose names appear on the application. At the time of the trial, plaintiff was not engaged in the insurance business.

Walter H. Fehr, plaintiff's witness, testified that prior to September 15, 1930, he was cashier and accountant for C. O. Jones Building Company and that in a sense he was Jones's secretary; that he first met plaintiff through buying a policy on his own life from the Capitol Life Insurance Company; that thereafter he discussed insurance some with plaintiff for himself; that he mentioned to plaintiff a possible change in Mr. Jones's insurance; that plaintiff first mentioned the Emancipator Policy to him about January, 1929, and gave him a sample; that he took this to Mr. Jones who then told him he had already talked to another agent of defendant about it; that Jones received various insurance propositions which he asked Fehr to look over and report to him; that at one time he gave plaintiff a list of Jones's insurance; that, however, Jones turned over his original policies to Shaw, the other agent of defendant; that plaintiff took him (Fehr) to defendant's local office once, and that witness went there at other times and that his discussions were with Schweich and Shaw; that witness was checking and comparing Jones's various policies submitted by different companies; that he did not know the application for insurance in question herein was signed and the first he knew about it was when the policies arrived; that Schweich, at one time, mentioned licensing witness as an agent; that Mr. Jones took $400,000 of insurance in defendant company; that he saw Donald Shaw in Mr. Jones's office at various times prior to February, 1929, on which occasions Shaw came to see Jones; that he had seen Shaw there occasionally, practically ever since he had been Jones's secretary—since January, 1927; stated he never knew plaintiff until May, 1928, and had no personal or political acquaintance with him outside the purchasing of a policy for himself; that their relations were not close; that he thinks plaintiff met Jones once, but could recall no other times; that such occasion was about May, 1928; that Jones's insurance holdings had become somewhat confused, and various insurance agents had been soliciting him for a "couple of years" prior to 1929; that Jones had the various agents meet together but plaintiff not present; the various proposals were turned over to witness for examination and report; that plaintiff did not go over the Emancipator policy with witness, but told him he was not very familiar with it; that it was Schweich and Shaw who gave him the information needed about the policy; that a few days after plaintiff had given witness the sample policy, Jones told him to give Shaw his contract for the policies. Jones introduced

Shaw to Fehr and told Fehr he was dealing with Shaw in the matter, and for Fehr to deal with Shaw from then on, which he did; that witness had many interview with Shaw; that Jones never gave his original policies to any other agent than Shaw; that he was called into the matter by Jones; that on one occasion, witness was in defendant's office shortly after the negotiations started, when he heard Shaw tell plaintiff:

"There has been a lot of misrepresentation by other agents . . . and that he was handling the case and that he was not rebating or allowing anybody a part of the commission;" that Shaw asked witness whether plaintiff had ever seen Jones regarding the insurance, and he replied he had not, and Shaw had also asked witness whether plaintiff had exerted any personal efforts in the matter of selling Mr. Jones the insurance, the witness answered that he had not; that witness afterwards conferred with plaintiff who "would just ask if the application had been signed and where he stood on it." Witness stated that after Jones told him to deal with Shaw (a day or two after he first got the sample policy), if plaintiff sat in on any conference at defendant's office, it was because he was already there as witness did not go with him; that thereafter, about all the conversation he had with plaintiff consisted of the latter's inquiries as to what had been done; that when plaintiff brought him the sample policy, he thought it was for himself and that this was his idea when he went to defendant's office with plaintiff; that he thinks the policies were given to Shaw on the day after witness gave the statement of Mr. Jones's insurance to plaintiff.

It was further in evidence in behalf of plaintiff that Shaw obtained the application from Jones for $100,000 insurance covering two $50,000 Emancipator Policies, together with a note for $2,040, covering the first year's premium, which was witnessed by Shaw, as agent, plaintiff's name not appearing thereon as "other agents," which application and note were turned over to Schweich and sent in to the home office. It is in evidence that it was the custom of the local office for the manager to receive the application, to O. K. the same, and send it in to the home office. After the issuance of the two $50,000 policies, as of April 3, 1929, applications for six more Emancipator Policies of $50,000 each were issued by defendant to Jones, and delivered under the application, in response to a verbal request from the Kansas City manager, issued as of April 27, 1929. This was included in the testimony of Alfred L. Dern (by deposition), manager of defendant's agencies at Fort Wayne, Indiana.

It is admitted that had plaintiff's name appeared on the application when it was sent in to the home office, the defendant would have insisted upon plaintiff's interest (if any) in the contract be-

ing adjusted, and that the premium was paid to Shaw because no other name than his appeared upon the application.

It is in evidence that Shaw received from defendant a total of $4202.40, which is 50 per cent of the first year's premium of $8160, less $3957.60, retained by defendant. Shaw obtained his commission in the following manner: When the first two policies, aggregating $100,000, were issued by defendant and sent to Kansas City, together with the note above referred to, Shaw delivered the policies and collected on the note and upon payment of the amount to the cashier in defendant's local Kansas City office, Shaw received the commission from the cashier.

Shaw also delivered the additional policies, collecting the first year's premium, which he turned in to the cashier as in the former instance, and the cashier then paid Shaw the commission thereon. In Shaw's words: "I remitted the whole amount to the cashier who, in turn, at the same transaction, remitted back to me my commission." Donald L. Shaw, on behalf of defendant, testified that he had known C. O. Jones since 1926, at which time he interviewed him with a view to selling him insurance, giving him a written proposal; that he was an agent of defendant; that he interviewed Jones from half a dozen to a dozen times; that Jones had witness out to his (Jones) house evenings along in 1928; that in December, 1928, he first heard of the Emancipator Policy of defendant; that he told Jones of it and explained its features; that he interviewed Jones from time to time after that until the insurance here in isssue was sold—in all probability twenty-five interviews, before he ever had any conversation with plaintiff on this subject. That at Jones's suggestion, about January, 1929, he got all of Jones's policies and made a sort of survey or detailed analysis of them, and checked up on the proposals of other companies; also interviewed Fehr (Jones's secretary) about them; that about January, or early in 1929, Mr. Schweich, local manager, told witness that plaintiff considered Jones a client of his and had had several interviews with Jones regarding the Emancipator Policy and other insurance; that he (plaintiff) was a very close personal friend of Jones's secretary; that Schweich did not want the office divided against itself; that plaintiff had then been in defendant's office only a few days; that a conversation followed between plaintiff, Shaw and Schweich, in which plaintiff said he had had several interviews with Jones, some while with another company and some concerning the Emancipator Policy, and he felt he could control Fehr; that after some discussion he (Shaw) told plaintiff they could work together on the case and arrive at some basis sharing commissions; that he then assumed plaintiff's representations were true; that he continued his work on Jones; knew of no attempt plaintiff made to write the business except that

at one time plaintiff brought Fehr to the office of defendant when he (Shaw) was not there; that plaintiff did not help him in making up any proposals and did not give him a list of Jones's insurance. That, following a conference of insurance agents in Jones's office, he (Shaw) told plaintiff in Fehr's presence that there had been misrepresentations by plaintiff in the case, and that he would split no commissions with him; that he (Shaw) wrote the application, procured the signature and sent it to defendant; and in "agent's report" stated "commission to be shared with no one." That Jones first applied for $100,000 insurance and subsequently took $300,000 more, for which he (Shaw) made collection of premiums; that to his knowledge, Schweich did not make any statement that Shaw and plaintiff would split the commissions fifty-fifty.

At this point, a letter from C. O. Jones directed to Schweich, dated April 4, 1929, was received in evidence, stating in part that the same was written at Shaw's request, and stating that he had had much helpful advice from Shaw and "I have confidence in entrusting my future life insurance to his hands." Shaw further testified he got all the commissions on the Jones policies; that Schweich did not tell him and plaintiff what they would have to do, but suggested the office be not divided; that there was no custom as to the division of commissions where one agent had already worked on the case before the other agent was called in; that he received about $4,000, as commission on the Jones insurance; that conversations with plaintiff consisted of inquiries by the latter as to "How are you coming along?"

C. O. Jones, testifying for defendant, stated Shaw took his application and to whom he paid the premiums; that he dealt with no other agent in the matter; that Shaw had been on his trail for about two years. He stated Fehr was his bookkeeper and not his secretary; that Fehr only checked over the different plans and submitted the figures to him at his request; that Shaw first talked to him about the Emancipator Policy; that he did not know plaintiff, that "I believe I was sold by Shaw;" that he directed Fehr to deal with Shaw "as to figures;" that he knew of nothing plaintiff did toward selling him the insurance.

H. C. Small, agent of defendant, testified that about March, 1929, Shaw told plaintiff in the presence of witness and Fehr that he (Shaw) had been working on the case for about two years, and that no one would share the commissions; that he could not recall any reply from plaintiff.

Paul R. Schweich, defendant's local manager, testifying by deposition, stated he employed agents with defendant's approval; that plaintiff first started with defendant under a brokerage contract about October, 1928, but that plaintiff was with another company

then; this arrangement continued until February, 1929; that since his agency continued he had written one $5,000 application, which was not paid for; that he did not think plaintiff had anything to do with procuring the Jones insurance; that sometime before the policies were written, plaintiff told him that he could make a prospect of Jones; that he told plaintiff Shaw was working on the case and had been for two and a half years, and that if any arrangements were made it would have to be done between the two; that he invited plaintiff and Shaw to talk together, which they did in a few days in his office; that witness only introduced the subject and Shaw finally said they would work together; that thereafter, they did not work together; that plaintiff never saw Jones thereafter, which fact he learned from plaintiff. That plaintiff, on one occasion, brought Fehr to his office, and the matter of paying Fehr a commission was brought up. Witness stated plaintiff was out of town when the Jones application was signed, but he thought he told plaintiff of it on the latter's return; that in the conversations in his presence nothing was said about compensation to Shaw or plaintiff, or of the commissions; that plaintiff inquired of him whether the insurance had been written and he told him it had not; that he thought the case closed so far as plaintiff was concerned, and that plaintiff was out of it; that that was his personal opinion of the situation. Schweich further testified defendant does not pay any commissions to agents whose names do not appear on the application, because (first) this is a matter of contract, and (second) endless confusion would result in an attempt to follow any other practice.

There was other testimony introduced, but this was corroborative of the disputed questions urged by each litigant.

There are six assignments of error presented, under five headings, under points and authorities. It is first urged the court erred in overruling the demurrer at the close of plaintiff's case, because there was no substantial evidence to show that plaintiff was the procuring cause of the business, or that his efforts substantially contributed to securing it.

Of course, in the consideration of a demurrer, the plaintiff's evidence must be accepted as true, and he is entitled to all inferences to be gathered from defendant's evidence. This rule is so thoroughly established that citations are unnecessary. It must be borne in mind that this is an action on *quantum meruit,* to recover the reasonable value of services rendered by plaintiff, in connection with the insurance in question, and is not bottomed on contract. The petition alleges:

"By reason of the efforts and work of plaintiff, said C. O. Jones did make application for and did receive policies of insurance in defendant's company . . ."

It was held in Hoyt v. Buder, 318 Mo. 1155, 1168, 6 S. W. (2d) 947, 952:

"Where, as in the instant case, the contract has been fully performed and nothing remains to be done except payment, the plaintiff may waive the contract and sue on a *quantum meruit* and use the contract as a basis for computing the amount due." (Citing cases.)

The evidence of plaintiff shows that Schweich, defendant's manager, directed plaintiff and Shaw to work together so the office would not be divided on the Jones insurance; that Shaw should work direct with Jones and plaintiff with Fehr, Jones's secretary; that this was agreed to by Shaw and plaintiff. Plaintiff testified he did work on the matter through Fehr, while Shaw worked direct with Jones. There was some dispute as to the amount and efficacy of plaintiff's work, but there is substantial evidence that he did something to further the consummation of the common effort. The question was for the jury's determination.

It is defendant's position that the commissions, on part of which recovery is sought, never passed into or through the hands of defendant, but were retained by another agent; that all the evidence shows there can be no recovery under the terms of plaintiff's written contract, which limits his right to recover, even on *quantum meruit*, and such written contract was not altered in any valid or effective way. From this premise, defendant argues the trial court erred in overruling defendant's demurrers at the close of plaintiff's case and at the close of the whole case.

The testimony shows Schweich was the general agent at Kansas City, empowered to contract with agents for his company; that he directed Shaw and plaintiff to work together on the Jones insurance. There is testimony the applications passed through the hands of Schweich and that he wrote his O. K. on them. This latter point is disputed. At any rate it might reasonably be inferred by the jury that the application in this case passed through Schweich's hands, and having directed or advised Shaw and plaintiff to work together in this instance, he should have seen to it that plaintiff's name was on the application. This he seems not to have done. Schweich was defendant's general agent and manager of its Kansas City office. It is the general rule that the title of manager carries more authority than that of general agent. A manager's powers are similar to those of officers of the company, and a general agent's authority is determined by the nature of the business, and is prima-facie co-extensive with his employment; thus, he is the *alter ego* of the company. [2 Couch's Encyc. of Insurance Law, sec. 509 G; Thompson v. Insurance Co., 169 Mo. 12, 68 S. W. 889, 892; James v. Mut. Res. Ins. Co., 148 Mo. 1, 49 S. W. 978; Springfield Steam Laundry Co. v. Traders Ins. Co., 151 Mo. 90, 52 S. W. 238, 240.

An examination of the cases cited by defendant in support of its contention that Schweich was without authority to bind defendant in what he did in regard to directing Shaw and plaintiff to work together in the procurement of the Jones insurance, shows the facts in those cases differ from those here presented. In the case of Lane v. Rainey, 39 S. E. 728, 129 N. C. 64, there was a question of the general agent authorizing one of his agents, Martin, to discontinue the services of another agent, Lane. The court held Martin had no authority to bind the general agent to the extent that Lane was entitled to commission on insurance Lane had already written. Equally inapplicable are the other cases cited, to-wit, Wichita So. Life v. Davis (Tex. App. 1918), 206 S. W. 728; Stearns v. Hazen, 101 Pac. 339; Rhone v. National Life (Colo.), 95 Pac. 298; Am. Surety Co. v. Sheerin (Tex.), 203 S. W. 1120. Of like character are the cases cited in defendant's reply brief on this point. We rule there was no error in the action of the trial court in overruling defendant's demurrers.

Defendant's second point is that the court erred in letting it be known that Schweich was a brother-in-law of Shaw, in that its purpose was to prejudice the jury against defendant. We hold this position untenable because, under such fact, the jury might well infer that Schweich was attempting to favor his brother-in-law to secure the commission, in failing to see to it that plaintiff's name was placed on the application. Thus the fact that such relationship existed had a direct bearing on the interest of the actors in this legal drama. Reference to this matter first was made in the opening statement of plaintiff's counsel to the jury, and again in the evidence of witnesses, in each instance over the objections of defendant. These matters are largely within the discretion of the trial court, and unless it is clearly shown that such discretion is abused, we are without authority to interfere. [Kull v. Ford Motor Co. (Mo. App.), 261 S. W. 734, 736.] There is nothing to indicate the court abused its discretion in this respect.

Defendant's point 3, is directed to alleged error in admitting in evidence proof of custom and practice in the Kansas City office, as to its operation with respect to what the general manager did. The basis of this charge is that custom and practice were not pleaded in the petition. We hold it was not necessary this plea should appear in the petition. The objection to the question was properly overruled, and when the question was answered, there was no motion to strike out, and the answer was permitted to stand.

It is also objected that certain features were developed which, as shown by the record, were uncontroverted and admitted by defendant. There can be no error in this situation, and we rule this point against defendant.

It is urged the court erred in giving plaintiff's instruction No. 1, in that it is broader than the pleadings, and permits recovery on less proof than required by the petition; and that it also submits the question of waiver, whereas the petition pleads performance; it is outside the scope of the pleadings and erroneously assumes on the part of Schweich authority to bind defendant in all matters involved. The instruction is rather lengthy and it is not necessary that it be set out. Defendant's objection is not tenable. Its argument is based on the fallacious position that plaintiff must have been the procuring cause. That is not the contention of plaintiff, but that the procuring cause was the joint work of Shaw and plaintiff. The instruction carries this idea, as does also the petition. There was no error in instruction No. 1, and this ruling applies to plaintiff's instruction No. 2, also, which defendant charges contains the same error; and this applies also to the question of waiver, in plaintiff's reply, to the effect that the conduct of defendant prevented plaintiff from performing. [Kretz v. Egelhoff, 231 Mo. 694, 132 S. W. 1124; Simons v. Schibsby (Mo. App.), 238 S. W. 811.] This was a proper reply and is in the nature of an avoidance. [Reid v. Brotherhood (Mo. App.), 232 S. W. 185; Menefee v. Scolly (Mo. App.), 247 S. W. 259, 261.]

Defendant claims the refusal of its instructions numbered 4, 5, 6, 7, 10 and 11, was error. The refused instruction No. 4 is, in effect, peremptory and was properly refused under the pleadings and facts in evidence. The same is true of defendant's refused instructions 5, 6, 7 and 11. Refused instruction No. 10, was not proper because it declared an abstract proposition of law, besides being misleading and outside the issues. It submits an undisputed point, to-wit, that defendant cannot be bound by agreements between plaintiff and Shaw. Being admitted by plaintiff, this question was not in issue.

We rule there is no reversible error of record, and the judgment should be and is affirmed. All concur.